## STATEMENT OF FACTS

Your affiant, Michael Fulton is a Detective with the Metropolitan Police Department ("MPD"), Homicide Branch and has been since 1990. As a Detective with the Metropolitan Police Department, I am authorized by law or by a Government agency to engage in or supervise the prevention, investigation, or prosecution of a violation of criminal laws within the District of Columbia. The information contained in this affidavit is based on my knowledge of the investigation and information provided by other law enforcement officers. Because this statement of facts is being submitted for the limited purpose of establishing facts sufficient for the charges in the complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence exists of violations of the following statutes: Title 18, United States Code, Section 1201(a)(1); Title 18, United States Code, Section 924(c)(1)(iii); and Title 18, United States Code, Section 2.

Initial Investigation

1. On May 2, 2009 at approximately 7:44 p.m. in the area of 5221 Indian Head Highway/Route 210, Prince George's County, MD, an officer with the Prince George's County Police Department, hereinafter referred to as W-1 or Witness-1, was sitting in a marked patrol car waiting for the traffic light to turn green. This area is right by the Eastover Shopping Center which is very close to the border between Maryland and the District of Columbia. W-1 reported hearing a gun shot behind him and looking in his rear view mirror. W-1 observed two vehicles to the rear of the Check Cashing store, one was a gray SUV/minivan, the other a gray 4 door sedan, possibly a Crown Victoria. W-1 exited his cruiser and attempted to run toward the vehicles, however, they fled onto Highway 210 toward Washington, D.C. W-1 returned to his cruiser and gave chase. Radio communications that take place as the chase is ongoing give a sense of the speed in which the situation unfolded.

2. On May 2, 2009 at approximately 7:55 p.m., callers began reporting the presence of a suspicious vehicle in the area of the 3800 block of Halley Terrace, S.E./20 Mississippi Avenue, S.E., Washington, D.C. Within a few minutes of receiving the 911 calls, law enforcement officers located a gray Chrysler Pacifica with the engine still running. In the front passenger seat, officers located the decedent, later identified as Kareem Ware, suffering from multiple gunshot wounds. The decedent was a black male, dark complexion, wearing blue jeans, a white t-shirt, brown sweat jacket, brown boots, white socks, and a black belt. D.C. Forensic Investigator Denise Lyles responded to the scene and officially pronounced the decedent dead at 11:45 pm. The decedent's remains were transported to the Office of the Chief Medical Examiner for an autopsy to determine the cause and manner of death.

3. On May 3, 2009, an autopsy was performed by Dr. Carolyn Revercomb on the remains of Kareem Ware. She determined that he suffered from three gunshot wounds to the head, two of which showed signs of powder tattooing near the entrance wounds, indicating that they were fired from a close range. Dr. Revercomb determined that the cause of death was multiple gunshot wounds to the head and the manner of death was homicide.

4. During the initial investigation it was decided that, because the gunshots were heard/observed on the Prince George's County side of the border, that Prince George's County Homicide Unit

would take the lead in the investigation. Throughout the investigation, detectives with Prince George's County Police, the Metropolitan Police Department, and agents with the Federal Bureau of Investigation interviewed a number of civilian and law enforcement witnesses and enlisted the assistance of a number of experts.

Statement of Witness-1, Prince George's County Police Officer

5. Detectives interviewed W-1, the officer who initially heard and observed the gunshots near the Eastover Shopping Center. W-1 provided a written statement to detectives, the first part of which appears to be more of a summary of the events that unfolded as opposed to W-1's specific factual observations, which are reflected in W-1's initial radio communications and during the question and answer portion of W-1's written statement. For example, when W-1 begins the vehicle chase, on the radio communications W-1 reports initially that the SUV he is chasing is a blue SUV/minivan, later correcting that it is actually gray or silver and indicating he does not know the make or model. However, in W-1's written statement, W-1 refers to the vehicle throughout as a gray Chrysler Pacifica, because, by the time he provided the statement to detectives, this fact has been determined by law enforcement. Along these lines, W-1 also states in the initial paragraph that when he first saw the vehicles near the Eastover Shopping Center he "observed several males hanging out of both vehicles pointing guns at one another then discharging multiple rounds" however, when asked specific questions in the statement about what he saw and as he was providing information to the dispatcher in real time, it is clear that these are assumptions and conclusions W-1 made. Similarly, W-1 also described that the occupants of the gray SUV "bailed out," with the exception of the front passenger who was dead. However, as is reflected in the radio communications and later in W-1'sstatement, it is clear W-1 did not actually see this, rather this is a conclusion he was drawing based on the fact that when the SUV was recovered, the only person still in the vehicle was the decedent. In this affidavit, the undersigned has attempted to include only W-1's observations, as opposed to W-1's conclusions or assumptions.

6. During the interview with detectives, W-1 stated that while at the traffic light in the 5200 block of Indian Head Highway/Route 210, he heard a gunshot behind him and looked in his rear view mirror. When W-1 looked in the rear view mirror, he was able to see a gray SUV and a gray 4 door sedan. W-1 stated he observed a gray SUV with occupants inside exchanging gunfire out of the window. W-1 stated that the occupants were pointing guns toward the parking lot of the 5200 block of Indian Head Highway/Route 210 and were exchanging gun fire. Specifically, W-1 observed the passenger in the back seat pushing his hand forward with a black in color object and exchanging fire. W-1 then observed the front passenger leaning out with the door open and with something black in color in his hand. After the gunfire was over, the back passenger pulled the front passenger back into the vehicle. Witness-1 observed that when the gray SUV exited the parking lot onto Audrey Lane heading toward Indian Head Highway/Route 210, the passenger door was open and the front passenger was hanging out of the door. The rear passenger pulled him in and shut the passenger door after the driver came to a complete stop on Audrey Lane.

7. W-1 stated that during the vehicle pursuit he quickly lost sight of the silver 4 door sedan and instead followed the gray SUV where he lost sight of the vehicle in a side alley of Yuma St. in Washington, D.C.. W-1 stated he again saw the SUV in the 3800 block of Halley Terrace, S.E.. At this time, the driver's door and driver's side rear passenger door were open. The only passenger in the car was the front passenger who was suffering from a gunshot wound to the head. W-1 further stated that during the pursuit he saw two individuals in the front of the SUV and one in the

rear.  W-1 recalled that the driver was wearing a white shirt with sun glasses and the front passenger also had a white shirt.

8. Witness-1 was again interviewed briefly in 2020 and in 2022.  During these interviews, W-1 reviewed his prior statements and listened to the recorded radio runs from the incident.  In response to questions, W-1 provided the following sworn testimony.  Witness-1 stated that he heard a shot, drawing his attention to a gray SUV.  He then heard another gunshot and saw what appeared to be a muzzle flash coming from the gray SUV.  Witness-1 observed the front passenger (later determined to be the decedent) leaning out of the passenger door with something black in his hand, which could have been a gun or a cell phone.  Witness-1 also observed the back seat passenger (defendant Evans) pulling the front seat passenger back in the vehicle, still holding a gun in his hand.  Witness-1 stated he believed, given the circumstances, that the two individuals in the gray SUV were exchanging fire with a second car, described as a Crown Victoria.  However, Witness-1 stated he never actually saw anyone in the Crown Victoria with a gun.

9. Witness-1 reported that the gray SUV and the Crown Victoria both sped off.  Witness-1 stated that as the gray SUV pulled off, it appeared that the back passenger and front passenger were struggling. The front passenger door was finally pulled shut when the vehicle turned onto Route 210 from Audrey Lane.  The gray SUV then floored it and headed straight into D.C.  Witness-1 estimated that it took 30 seconds or less for the vehicle to enter the District of Columbia.  Prior to leaving the Eastover Shopping Center, Witness-1 stated he never observed the rear passenger fire two bullets at close range into the head of the decedent.  As Witness-1 was following the gray SUV on Livingston Road, in the District of Columbia, the passenger in the back seat and passenger in the front seat appeared to be struggling with one another.  At that point, on Livingston Road in the District of Columbia, the front passenger appeared to be alive.

10. At some point after Witness-1 observed the struggling, as they were making turns during the chase, he saw the front seat passenger with his head going toward the window.  While following the vehicle, Witness-1 did not hear gunshots, however, he stated it was possible shots were fired within the gray SUV as he was chasing the vehicle.  Specifically, Witness-1 ficer stated that after a short distance – when he was on Livingston Road – he began to lose ground on the gray SUV during the pursuit.  Additionally, Witness-1 was on the radio relaying information to the dispatcher.  Witness-1 stated that after crossing Southern Avenue from Maryland into D.C., he only followed the vehicle in D.C. until he lost sight of it.

Additional Witness Interviews

11. Law enforcement also spoke with the following individuals in the area where the gray Chrysler Pacifica was located.  A witness herein identified as W-2 reported seeing a black male wearing a brown jacket in the roadway who looked like he exited the vehicle.

12. Another witness, identified herein as W-3, stated that IT saw a suspect bail out of the vehicle.  W-3 described the individual as a black male, 5'6", 140-150 lbs wearing a white tank top, blue jeans and fancy sunglasses.  A follow up interview with W-3 was conducted in August 2014.  During that interview, W-3 stated that IT recalled seeing a vehicle turn onto Halley Terrace.  W-3 could only see the back and maybe the top of the vehicle, however, W-3 was able to observe a black male run from the vehicle and into the woods.  The male remained in the woods as the police sped through the area.  The male waited in the woods until the police were gone – for

approximately one minute -- then ran out of the area onto First Street in the direction of the 100 block of Yuma Street.  W-3 stated IT believed IT pointed out to officers on the scene the area where the male ran.  W-3 stated that when the male ran to the woods, W-3 observed the male take off a shirt or something while hiding from the police.  When interviewed in 2014, in terms of describing the male, W-3 could only remember that the male was not light-skinned, and was possibly dark complected.

13. Law enforcement also spoke with two witnesses in the Eastover Shopping Center.  On May 2, 2009, another witness, hereinafter referred to as W-4, was interviewed and stated the following.  IT observed a dark gray SUV come across the parking lot of the Eastover Shopping Center.  IT observed a young man driving and another man running behind who jumped through the passenger window.  They then drove off through the parking lot onto East Capital Street.  W-4 also stated that IT heard a gunshot before the event, but did not see the shooting or who was shooting.  W-4 stated that IT heard 3 shots, but it could have been more.  W-4 stated that the driver was brown skinned wearing a black hat and the person running toward the SUV was wearing blue jeans and tennis shoes, possibly black and white.  W-4 stated IT could not tell if anyone else was in the SUV, IT did not see anyone else with a gun, and IT did not see anyone else drive away.  It is not clear if the dark gray SUV that W-4 is referring to is the Chrysler Pacifica.  In 2020, W-4 was again interviewed.  At that time, W-4 stated IT had no recollection of these events and had no recollection of ever providing a statement to police.  W-4 inferred the statement was made by someone who had stolen ITs identity.

14. On May 2, 2009, a witness, hereinafter referred to as W-5, was interviewed and reported the following.  While standing outside the DTLR in the Eastover Shopping Center, IT overheard an argument, but could not see who was involved in the argument.  IT then heard 3-4 gunshots and observed a silver Lincoln Continental, 4 door, with dark tinted windows drive away.  W-5 was interviewed again in 2020.  At that time, W-5 confirmed the information in ITs 2009 statement.  W-5 stated that IT did not recall seeing any police at the time of the incident.

15. During the investigation, law enforcement also identified the owner of the Chrysler Pacifica, hereinafter referred to as W-6.  W-6 stated that IT allowed another individual, identified as W-7, to drive the Chrysler Pacifica.  W-6 stated that at 8:01 pm on May 2, 2009, W-7 called IT and stated that W-7 was carjacked at the BP gas station on Wheeler Rd.  W-6 went to Wheeler Rd and located W-7 and then W-6 called the police to report the incident.  When W-6 arrived at Wheeler Rd., it observed W-7 in the parking lot sitting in what W-6 described as a blue Cadillac.  At the time, no one else was in the Cadillac with W-7.  W-6 stated IT had never seen the Cadillac before.  W-6 was asked to identify W-7's close friends, and W-6 identified two individuals to include "Sieve."  W-6 described "Sieve" as a black male, brown skin, dreads, medium build, 22 or 23 years old, with facial hair.  In the statement it is unclear if W-6 stated that "Sieve" is approximately 5 feet tall or 5'11".  W-6 was shown a photograph of Saeve Evans, PDID 542-667, who IT positively identified as the individual IT knew as "Sieve."  When W-6 was asked when W-7 last saw Saeve, W-6 stated that, to IT's knowledge, W-7 was last with Saeve that day.

16. Law enforcement also spoke with W-7.  Initially, W-7 reported that at approximately 7:50-8:00 pm, IT was carjacked at a BP gas station on Wheeler Rd.  W-7 stated that IT was approached by three black males wearing white t-shirts, blue jeans and masks who demanded the vehicle and W-7 stated IT complied because ZW-7 thought they had guns.  W-7 also stated that none of the men showed or implied that they had a weapon.  After the car was stolen, W-7 stated IT went

across the street and used the phone to call someone to pick IT up and after called W-6 to tell W-6 that the car had been stolen. According to W-7, W-7 called IT's buddy Carlos, whose number was 202-421-xxxx to pick up W-7. W-7 described Carlos as a black male, 6'1", medium complexion, in his 20s, slim build, short hair cut, wearing a green polo shirt.

17. Law enforcement investigated W-7's account as well as the information that was provided. La enforcement also learned that the vehicle (the blue Cadillac) that W-7 was found in by W-6 after the alleged carjacking was registered to a Nakia White, with an address of 1011 14th Street, S.E. Apt. 32, Washington, D.C. This is the same address that is shared by Saeve Evans's mother and has been linked to Saeve Evans. Additionally, numerous personal papers were recovered from the vehicle, including many in the name of Saeve Evans. Law enforcement also reviewed surveillance footage from the BP gas station where the alleged carjacking was to have taken place and the footage did not support W-7's account of the alleged carjacking.

18. When confronted with this information and told that IT could be charged with a crime, W-7 eventually admitted that IT and Saeve Evans had exchanged vehicles earlier on May 2, 2009, *i.e.,* the gray Chrysler Pacifica and the blue Cadillac. W-7 stated that at some point that evening IT received a call from an unknown caller telling IT that IT needed to file a stolen vehicle report for the gray Chrysler Pacifica.

19. A witness, hereinafter referred to as W-8 was interviewed in both 2011 and 2012. When W-8 was interviewed in 2011, IT was facing significant felony charges. When W-8 was interviewed in 2012, W-8 had entered into a cooperation agreement with the government in which W-8 agreed to plead guilty to significant felonies in return for the government providing information to the sentencing judge about W-8's cooperation. W-8 stated that, at the time, IT had known an individual by the name Saeve Evans for over five years and saw Evans regularly. W-8 was shown a confirmation photograph of Saeve Evans, PDID 542-667 and W-8 positively identified it as the individual IT knew as "Saeve."

20. W-8 indicated that Saeve Evans had access to more than one vehicle, but that Evans drove a Cadillac that W-8 described as green. W-8 stated that IT last saw Evans drive that Cadillac in the summer of 2009.

21. W-8 identified Saeve Evans as an individual who sold large quantities of PCP and cocaine in Southeast, D.C. in late 2008/2009. W-8 also identified the decedent in this case by the nickname "B." W-8 stated that in 2009 IT also knew "B" to sell large quantities of cocaine in the area of Oak Park, in Southwest, D.C. When asked when "B" was killed, W-8 stated it was in the summer of 2009, however, W-8 did not know the month. W-8 stated that "Fat Fat" shot him up with Saeve Evans. When specifically asked who shot "B", W-8 stated "Saeve." W-8 stated that in the summer of 2009 IT heard Saeve state that "Fat Fat" had him on a "fluke mission," meaning a robbery gone bad. Evans elaborated that when they met "B" for a drug deal it got ugly and Evans had to shoot him in the head. Evans stated that he (Evans), "Kamau," and "Fat Fat" picked up the decedent in the area of Oak Park in Southwest, D.C. and that "Fat Fat" was driving the car. When interviewed in 2011, W-8 stated that IT recalled Evans stating that "Kamau" was in the front passenger seat and "B" was in the rear seat with Evans, however, in 2012, W-8 could not recall where Evans indicated people were seating other than the driver. W-8 stated that Evans said that the plan was to pick up the decedent and then "Fat Fat," "Kamau", and Evans would rob the decedent of whatever drugs and/or money the decedent had available. The group traveled toward Southern

Avenue (the border between MD and DC). According to Evans, things got ugly during the course of the robbery when the decedent saw the police and tried to take the gun from Kamau. Evans stated at that point he shot the decedent in the head because there was no telling what the decedent would have done if he was able to get the gun from "Kamau." Evans stated that the police then chased them in the car from Maryland into D.C.

22. W-8 stated that Evans also indicated that he believed he left a shirt, hat and a CD in the car that was used during the robbery/murder. Evans stated he was also frustrated because "Fat Fat" told him that the decedent was supposed to be a big target, but it turned out that he was not.

23. W-8 identified the individual IT knew as "Scorpio" or "Fat Fat." W-8 stated IT knew "Fat Fat" from the area of Oak Park. W-8 was shown a photograph of Scorpio Phillips, PDID 508-486, who IT positively identified as "Scorpio" or "Fat Fat."

24. W-8 stated that IT had known "Kamau"/"Kamal" for years and knew "Kamau"/"Kamal" also went by the nickname "Malaki." W-8 stated IT did not know "Kamal's" last name, but stated his brother's last name is Blakey. W-8 was shown a photograph of Kamau Blakney, PDID 508-486, who IT positively identified as "Kamal."

25. In June 2014, Scorpio Phillips, aka "Fat Fat" was interviewed by law enforcement. Phillips has since been murdered. Phillips admitted to knowing the decedent in this case and stated he knew the decedent to hang out in the Oak Park neighborhood in Southwest, Washington, D.C., but claimed that he did not know the decedent to ever sell drugs. Phillips also stated that he knew Saeve Evans by name and knew his nickname as "Sy" and stated he had spoke to him one time since returning from USP Lee in February 2014. Phillips denied any knowledge of the circumstances of Ware's murder.

26. An individual, identified herein as W-9, called law enforcement and stated that an individual named Lamont Jenkins allegedly knows that the shooter is someone who drives a Honda Element, DC Tags CJ 6312 who may live at 801 Kenilworth Ave. The investigation has not revealed any additional information in connection with this tip.

27. During the investigation, detectives became aware that a murder occurred on April 28, 2009 in Condon Terrace. The victim was Richard Robinson and, given the date and close physical proximity, it was speculated that there could be a connection between the murder of Robinson and the murder of Kareem Ware. Since that time, an individual named James Rico Wood was arrested and pled guilty to the murder of Robinson. The investigation has revealed no connection between the murder of Richard Robinson and the murder of Kareem Ware. Additionally, MPD Intel also reported that the areas of Irving St., SE and Yuma St., S.E. were "beefing." The investigation has revealed no connection between this "beef" and the murder of Kareem Ware.

28. Family members of Kareem Ware reported that individuals at the decedent's funeral reported that the suspects were from Oak Park in S.W. Washington, D.C.

29. An additional witness, W-10, was interviewed. At the time of the murder W-10 was in a close relationship with the decedent. W-10 stated that when the decedent left ITs home the day the decedent was murdered, IT was lying in bed. W-10 stated that IT overheard a phone conversation between the decedent and another individual. Based on what the decedent said, W-10 believed

6

that the decedent was heading out to meet the person on the other end of the phone. W-10 stated that after the call, the decedent asked W-10 to borrow W-10's vehicle so that IT could run to the store. W-10 assumed that the decedent was referring to a store in the Eastover Shopping Center given that was the closest shopping center. W-10 stated IT never actually saw where the decedent went as IT remained inside the building. W-10 stated that when IT last saw the decedent, he was carrying a bag, which W-10 described as a brown paper bag. W-10 stated IT believed there was money or drugs in the bag. W-10 stated ITs belief was based on the fact that shortly after the decedent was killed, an individual who was close to the decedent came to W-10's apartment and stated IT was looking for drugs, money and a gun that belonged to the decedent. W-10 stated that despite looking, the individual could not find any drugs or money and these items appeared to be missing. W-10 stated that the individual did find a gun, hidden underneath a sink. W-10 stated IT had no idea that the gun had been hidden under the sink. W-10 also stated that IT had never seen drugs in the apartment, but that the decedent would not have allowed W-10 to see drugs in ITs apartment.

30. W-10 stated that when the decedent left, he had W-10's car keys as well as a wallet, however, W-10 stated that IT did not believe the decedent carried bank cards or credit cards. W-10 stated that ITs best recollection is that the decedent left around 7:00pm or 7:15 pm. W-10 also stated that the decedent had keys, which included W-10's apartment key, that the decedent normally carried. W-10 could not recall whether the decedent carried the keys on a lanyard or on a key ring.

31. During the meeting with W-10, discussed above, W-10 stated IT went looking for ITs vehicle the day following the murder. W-10 stated that IT located ITs vehicle in the Eastover Shopping Center parked directly in front of the DTLR. W-10 stated that the vehicle was a rental vehicle and that the keys associated with the vehicle included a tag from the rental company. Upon locating the vehicle, no keys could be found for the vehicle. W-10 was told by the rental company that IT had to return the vehicle with keys or else it would be charged a significant amount of money. Thus, W-10 reached out to a lock smith and paid approximately $500 to obtain a new key fob for the vehicle. W-10 stated that IT then returned the vehicle to the rental car company. Prior to returning the vehicle, W-10 stated that IT observed there was nothing in the vehicle belonging to the decedent. Specifically, there were no drugs, money, brown paper bags, or other personal belongings of the decedent. Additionally, W-10 stated that the set of car keys that IT previously gave to the decedent were not located in the vehicle.

Forensic Evidence

32. On May 2, 2009, evidence technicians responded to two scenes, to include the area behind the Check Cashing store located in the area of the 5200 block of Indian Head Highway/Route 210 in Prince George's County Maryland. In this area, technicians located/swabbed two areas where they identified what appeared to be drops of blood in the roadway. The area of the blood droplets was consistent with the area where the gray Chrysler Pacifica was observed by W-1 prior to the front passenger being pulled back into the vehicle by the back passenger. The swabs were later tested and compared to DNA profiles developed from samples obtained from, among others Kareem Ware and Saeve Evans. The DNA profile developed from these samples is consistent with the known DNA profile of Kareem Ware.

33. The second area where evidence was processed was the location of the recovery of the Chrysler Pacifica in the 3800 block of Halley Terrace/20 Mississippi Avenue, S.E.. Inside the vehicle, there

was a significant quantity of blood and brain matter. Additionally, a box cutter and folding knife were recovered from inside the glove box. Located on the driver's seat was a black skull cap and documents belonging to the decedent, Kareem Ware.

34. A canine unit was called to the area where the Chrysler Pacifica was recovered and tracked to a wooded area on the block where a dark colored jacket and sunglasses were recovered. Inside the pocket of the jacket law enforcement recovered a Chevy Chase check card in the name of Saeve Evans. Technicians also found a blood trail from the back seat of the driver's side of the Chrysler Pacifica leading toward the 3800-3900 block of South Capitol Street. Later testing on the swabs of blood from inside the vehicle and outside the vehicle were consistent with the DNA profile developed from the sample obtained from the decedent Kareem Ware. Swabs from the arms and nose pad of the sunglasses were compared and found to be consistent with the DNA profile that was developed from the sample obtained from Saeve Evans. Swabs taken from the arms of the dark colored jacket, on areas that had staining consistent with possible blood, were compared and found to be consistent with the DNA profile that developed from the sample obtained from the decedent Kareem Ware. Cuttings taken from the inside neckline of the jacket did not yield a DNA profile so no conclusion could be reached. A cutting from the outside bottom edge near the zipper of the jacket yielded a mixed DNA profile that is consistent with the DNA profile of the decedent Kareem Ware and additional minor alleles at three loci from at least one unknown contributor. Saeve Evans is excluded as a possible contributor from that minor profile.

35. A trajectory analysis was conducted in this case and revealed a possibility of two shooters. A subsequent firearms analysis was conducted on (1) a fired bullet jacket, lead bullet core, fired bullet jacket fragment recovered from the decedent's remains during the autopsy; (2) a fired bullet jacket fragment and lead fragment recovered from the decedent's remains during the autopsy, (3) two fired bullets recovered from the front door of the Chrysler Pacifica, and (4) two 9mm Luger cartridge casings recovered from the floor of the Chrysler Pacifica. The examination indicated that the two cartridge casings were fired in the same unknown firearm. The fired bullets and fired bullet jacket, lead bullet core, and fired bullet jacket fragment were fired from the same firearm. The final item had no microscopic value for comparison.

36. The trajectory analysis conducted in this case also looked at the defects noted on the interior side of the passenger's front door and the passenger's side door post. Based on the analysis of the path of the projectile that made these defects, the analyst concluded that the weapon was discharged from the rear passenger's seat area. The examination also revealed that the passenger's front door was open approximately 1'8" [one foot, eight inches] when the weapon was discharged causing these defects.

37. A blood spatter analysis was conducted of the crime scene inside the Chrysler Pacifica. The examiner concluded that the decedent was inside the car when the incident took place, however, the front passenger side door was at least partially open at some point when blood was spattered for the blood pattern to occur in the door jam and rocker panel molding area. Based on the wipe patterns in the blood throughout the car, as well as the areas of the car that were void of blood, it is consistent that an object (i.e., a person) was sitting in the driver's seat, front passenger seat, and both rear seats. There was one pattern that did not indicate that the victim who was struck and bleeding was in the front passenger area and this was a droplet pattern that appeared on the roof pillar near the driver's seat belt attachment. This pattern would indicate a source of blood coming

from the rear to the driver's side front. All other patterns indicate that the person who was struck and bleeding was in the front passenger seat area.

38. The blood spatter expert also has opined that with a gunshot exit wound there will be a large amount of misting and forward spatter that results from blood travelling in the same direction as a result of an external force applied. In other words, the blood travels in the same direction as the bullet itself. The expert has opined that some of the forward spatter patterns in the front passenger area are consistent with a bullet traveling from back to front while the passenger was seated in the front passenger seat facing forward. This is consistent with the decedent sitting in the front passenger seat facing forward as opposed to hanging out of a vehicle.

39. The medical examiner in this case has also opined that with respect to the wound identified as Gunshot Wound A that is referenced in her autopsy report, this wound was the most superficial of the three head wounds sustained by the decedent. She has opined that this wound was the least likely to be fatal and it may not have killed the decedent had he received prompt medical treatment. Without medical treatment, the decedent would have survived for some amount of time, calculated in terms of minutes, not hours. Additionally, the medical examiner has opined that after receiving this wound, the decedent could have still been moving around. The medical examiner has opined that the two other wounds - Gunshot Wounds B and C - resulted in more direct brain injuries to the decedent. Both of these wounds also showed evidence of powder tattooing, which indicates that the shots were fired within ½" to 12" from the body.

    Your affiant submits there is probable cause to believe that Saeve Evans violated Title 18, United States Code, Section 1201(a)(1), which makes it a crime to commit a Kidnapping Resulting in Death; Title 18, United States Code, Section 924(c)(1)(iii), which makes it a crime to Use, Brandish and Discharge a Firearm During a Crime of Violence; and Title 18, United States Code, Section 2, which makes it a crime to Aid and Abet.

_____
Detective Michael Fulton
Metropolitan Police Department

*Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 21st day of February 2022.*

_____
ZIA M. FARUQUI
U.S. MAGISTRATE JUDGE